*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| *UNITED STATES OF AMERICA* ) | |
| ) | |
| *v.* ) | *Criminal No. 05-82-P-H* |
| ) | |
| *VIVIAN WILSON,* ) | |
| ) | |
| *Defendant* ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Vivian Wilson, charged in a two-count superseding indictment with distribution of five grams or more of cocaine base on or about August 9, 2005 (Count I) and September 1, 2005 (Count II) and aiding and abetting such conduct, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2, seeks to suppress statements he made in the wake of his arrest on September 1, 2005.  *See* Superseding Indictment (Docket No. 57); Motion To Suppress Statements ("Motion"), contained in Omnibus Pretrial Motions (Docket No. 64) at 3-5.  An evidentiary hearing was held before me on May 11, 2006 at which the defendant appeared with counsel and at the conclusion of which counsel for both sides argued orally.  I now recommend that the following findings of fact be adopted and that the Motion be denied.

**I. Proposed Findings of Fact**

On the evening of September 1, 2005 Scarborough police officer Steven Thibodeau, a member of a Drug Enforcement Agency ("DEA") task force, was called upon to participate in an undercover

drug transaction in Auburn, Maine. Thibodeau had been informed that an undercover officer was going to purchase crack cocaine from a middleman who, in turn, was to receive the cocaine from an individual named Vivian Wilson. Thibodeau, fellow DEA task-force agent Greg Boucher and other officers and agents positioned themselves in several vehicles in the parking lot of a T.J. Maxx store in Auburn. Thibodeau observed a white Chevrolet Blazer pull into the parking lot and heard, via two-way radio, that the expected drug transaction was transpiring. Thibodeau and Boucher then were instructed to arrest the defendant, Vivian Wilson, who had exited the Blazer and was near the entrance to the T.J. Maxx. Thibodeau and Boucher pulled their vehicle closer to the T.J. Maxx (about thirty feet from its entrance), jumped out and ran toward Wilson, shouting, "Police! DEA! Stop!" and ordering him to the ground. Both Thibodeau and Boucher were wearing vests emblazoned "DEA," and Boucher had his gun drawn.

The defendant turned around, observed Thibodeau and Boucher, and fled into the T.J. Maxx. The agents pursued him through the front doors, the breezeway and the doors into the main part of the store. Sprinting through a crowd of shoppers, Thibodeau caught up with the defendant about ten feet into the store and tackled him face down to the floor, landing on top of him. Thibodeau began to try to subdue the defendant, ordering him to show his hands. The defendant resisted, hiding his hands underneath his belly. Throughout this brief scuffle – which lasted no more than a minute – Boucher kept his gun trained on the defendant. A third DEA task-force agent, Barry Kelly, quickly came to Thibodeau's and Boucher's aid, helping Thibodeau handcuff the defendant's hands behind his back. Thibodeau then assisted the defendant to a standing position. Kelly gathered belongings of the defendant that were strewn on the floor nearby, including a hat, keys and a $100 bill. Thibodeau and Kelly escorted the defendant out of the store to a bench on the sidewalk outside that was illuminated by storefront and parking-lot lighting.

As Thibodeau was handcuffing the defendant, he noticed blood on the floor; when he raised him to a standing position, he observed that the defendant had sustained a cut on his eyebrow. As soon as Thibodeau and Kelly seated the defendant on the bench, they obtained a medical kit from another officer. Blood was streaming down the defendant's face and onto his clothing. Thibodeau advised the defendant that he was under arrest for selling crack cocaine and told him he was going to take a look at his eye to see if he could help him. He applied pressure to the wound, which stopped the bleeding, cleaned the cut and affixed a couple of butterfly bandages to it. The defendant, who had no difficulty walking, was receptive to Thibodeau's help.

After Thibodeau finished tending the wound – about ten to twenty minutes after the defendant had been apprehended – he retrieved a standard DEA *Miranda* card from his wallet. *See* Gov't Exh. 2.[1] In Kelly's presence, at about 8:20 p.m., he read the defendant his *Miranda* rights, pausing after each to ask if the defendant understood it. The defendant responded that "yes," he understood each right. The defendant confirmed that he was waiving his *Miranda* rights and agreeing to speak with agents. Thibodeau then began to question him about the drug transaction.
The defendant appeared to Thibodeau to be paying attention to his *Miranda* rights as Thibodeau read them and at no time appeared to have any difficulty understanding Thibodeau.

Thibodeau questioned the defendant for approximately half an hour. During that time several other agents, including Kelly and DEA special agent Katherine Barnard, were present at certain points and also asked the defendant some questions. At no point during questioning did any agent have a gun drawn or pointed at the defendant. None of the agents asked the defendant if he was having any

---

[1] Per *Miranda v. Arizona*, 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at
*(continued on next page)*

problems understanding because of his injury. However, he did not complain about his cut or ask for additional medical attention. He appeared lucid: He seemed to understand all questions asked of him, and his responses made sense. Neither Thibodeau, Kelly nor Barnard had any difficulty understanding the defendant, who did not appear to any of them to be under the influence of drugs or alcohol.[2] At no time after waiving his *Miranda* rights and agreeing to speak with the agents did the defendant indicate to any of the three agents that he did not wish to answer questions.

During questioning, the defendant was quiet, cooperative and appeared to be a bit nervous. No threats or promises were made to him. Kelly did ask the defendant if he was willing to help himself and cooperate, and the defendant said that he was. Kelly did not promise leniency from the court system but said he would convey the fact of any such cooperation to the prosecutor, indicating this might help the defendant down the road.

At the conclusion of questioning the defendant was transported to the Cumberland County Jail. There, jail officials determined that the cut on his brow likely required stitches and that he should be taken to a hospital. Barnard was among those present at the hospital with the defendant. She observed that he was able to respond lucidly to intake questions from hospital staff regarding his identity, date of birth and insurance. After a wait of two to three hours the defendant received stitches, following which he was transported back to jail.

## II. Discussion

At hearing, counsel for the government conceded that the defendant was subjected to custodial interrogation, while counsel for the defendant acknowledged that he had been administered a *Miranda*

---
478-79.

[2] At some point that evening, Thibodeau also asked the defendant whether he had ingested drugs or alcohol, and the defendant denied that he had.

warning. As both counsel agreed, these concessions leave only one live issue for resolution by the court: whether the defendant knowingly and voluntarily waived his *Miranda* rights. *See* Motion.[3] I conclude that the government meets its burden of proving that he did.

As the First Circuit has noted:

> A defendant may make a valid waiver of his rights under *Miranda* if he does so voluntarily, knowingly and intelligently. The district court must begin with the presumption that the defendant did not waive his rights. The government bears the burden of proving a valid waiver by a preponderance of the evidence.

*United States v. Downs-Moses*, 329 F.3d 253, 267 (1st Cir. 2003) (citations omitted). A waiver is considered "voluntary" if it was "the product of a free and deliberate choice rather than intimidation, coercion and deception"; it is "knowing and intelligent" if "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon." *United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000) (citations and internal quotation marks omitted). The question whether a given waiver was voluntary, knowing and intelligent is examined with reference to "the totality of the circumstances and the facts surrounding the particular case including the background experience and conduct of the accused." *Id*. (citation and internal quotation marks omitted).

I turn first to the question whether the defendant's waiver was voluntary. As the First Circuit has observed, while mental history or state is pertinent to a voluntariness inquiry, "the precedents still require some degree of coercion or trickery by government agents to render a statement involuntary[.]" *United States v. Santos*, 131 F.3d 16, 19 (1st Cir. 1997); *see also, e.g., United States v. Rojas-Tapia*, __ F.3d __, No. 04-1846, 2006 WL 923990, at *5 (1st Cir. Apr. 11, 2006) ("[T]he fact that

---

[3] The defendant asserted in his Motion that English-language difficulties, among other things, contributed to lack of a knowing, voluntary and intelligent waiver of his *Miranda* rights. *See* Motion at 4-5. At hearing he introduced no evidence of any such difficulties, while the government introduced evidence (in the form of a copy of a transcript of preliminary-hearing proceedings held before me on September 8, 2005) tending to show that he does comprehend English. *See* Gov't Exh. 1. Accordingly, I have made no finding of English-language deficits.

Rojas-Tapia has a relatively low I.Q., standing alone, is not dispositive of the waiver determination. A defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness. Rather, the voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word.") (citations and internal punctuation omitted); *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) ("A confession or other admission is not deemed coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged. The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

The government has demonstrated by a preponderance of the evidence that no agent employed coercive or abusive practices to extract a waiver or confession from the defendant. Force was applied for the legitimate purpose of arresting the defendant after he fled into a crowded store. As soon as the arrest was effectuated, agents stopped shouting at the defendant and holstered their weapons. No agent exploited the fact of the defendant's head injury to obtain a waiver or confession; to the contrary, Thibodeau provided prompt first aid, refraining from administering *Miranda* warnings until the cut had been cleaned and the bleeding stopped. The defendant did not thereafter complain that the wound was bothering him or ask for further medical attention, and he appeared lucid.

The agents' questioning was not protracted, lasting only about half an hour. No one made threats or promises. While agent Kelly did ask the defendant if he wished to help himself and cooperate, and told him he would pass along the fact of any cooperation to the prosecution, Kelly did not promise the defendant that any particular benefit would materialize if he confessed. In any event, the First Circuit has questioned whether even a false promise of leniency amounts to coercion for purposes of a voluntariness inquiry. *See United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998)

("[I]t would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution.") (emphasis in original).

Even assuming *arguendo* that the defendant misunderstood Kelly's statements as promises of leniency, such a unilateral misunderstanding would not suffice to render his *Miranda* waiver or confession involuntary: The focus, again, is on curbing abusive police practices. *See, e.g., United States v. Male Juvenile*, 280 F.3d 1008, 1022-23 (9th Cir. 2002) ("Without evidence of coercion, the personal characteristics of the defendant are constitutionally irrelevant. Pierre's misunderstanding about the purposes for which his statements could be used did not stem from misrepresentation by the tribal investigators and therefore does not, on its own, constitute a showing of police coercion sufficient to warrant suppression of his statements.") (citation omitted); *United States v. Rowley*, 975 F.2d 1357, 1361 (9th Cir. 1992) ("Although Rowley's statements were given in the hope of leniency, they were not given with the promise of leniency, and thus were not involuntary on that score.").

The government has demonstrated, by the preponderance of the evidence, that no coercive or abusive police practice was employed to extract the defendant's waiver of his *Miranda* rights or his confession. Accordingly, it has shown that both were given voluntarily.

The question remains whether the defendant's waiver of his *Miranda* rights was knowing and intelligent. Here, again, the government carries its burden. No evidence was adduced at hearing that the defendant suffered from mental problems or was otherwise incapable of understanding his rights or the consequences of their waiver – the substance of which Thibodeau conveyed to him on the evening in question. The defendant had been involved in a stressful event, having just been forcibly arrested by agents at gunpoint and knocked to the ground, during which he sustained a cut to his brow sufficiently sizable to require stitches. Nonetheless, these events did not have an incapacitating effect on the defendant: He appeared able to comprehend questions asked of him both by agents and hospital

personnel, responded cogently, and communicated in such a fashion that he could be readily understood. He did not indicate that he was in pain or discomfort or required additional medical attention. In the circumstances, the government has proved by a preponderance of the evidence that the defendant was capable of, and did, knowingly and intelligently waive his *Miranda* rights. *See United States v. Brooks*, 125 F.3d 484, 491 (7th Cir. 1997) ("Mr. Brooks asserts that, because he was experiencing the effects of crack cocaine, sleep deprivation, and a hand injury at the time the FBI agent asked him to waive his *Miranda* rights, he did not possess the mental capacity to execute a voluntary, knowing and intelligent waiver. The district court's findings of fact foreclose Mr. Brooks' claims. As we set forth comprehensively above, the district court found that, during the FBI interview, Mr. Brooks was alert and coherent; he never complained of great pain and was given an aspirin when he requested it. The court also noted that Mr. Brooks gave no indication that he was seriously sleep-deprived or on cocaine at the time."); *United States v. Mayhew*, 380 F. Supp.2d 915, 928-30 (S.D. Ohio 2005) (finding, based primarily on review of videotape demonstrating overall lucidity despite some moments of confusion, that murder suspect who had shot himself and was being transported by ambulance to hospital knowingly and intelligently waived *Miranda* rights).

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and that the Motion be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days*

*after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.*

Dated this 12th day of May, 2006.

>                              <u>/s/ David M. Cohen</u>
>                              David M. Cohen
>                              United States Magistrate Judge

*after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.*

Dated this 12th day of May, 2006.

                    <u>/s/ David M. Cohen</u>
                    David M. Cohen
                    United States Magistrate Judge